UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EULENA MORRIS, on behalf of V.V.,

Plaintiff,

-v-

COMMISSIONER OF SOCIAL SECURITY ,

Defendant.

CIVIL ACTION NO.: 20 Civ. 7017 (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff Eulena Morris ("Ms. Morris"), on behalf of her minor niece, V.V., commenced this action pro se pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  She seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying V.V.'s May 2017 application for Supplemental Security Income ("SSI") benefits under the Act.  Ms. Morris contends that the decision of the Administrative Law Judge ("ALJ"), dated June 14, 2019 (the "ALJ Decision"), "was not supported by substantial evidence in the record, or was based on legal error."  (ECF No. 15-1 at 2).

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On July 15, 2021, the Commissioner filed a motion for judgment on the pleadings (ECF No. 23 (the "Commissioner's Motion")) and, on November 10, 2021, Ms. Morris, through counsel, cross-moved.  (ECF No. 29 ("Ms. Morris' Motion")).  Both parties filed reply

briefs.  (ECF Nos. 31, 34).  For the reasons set forth below, Ms. Morris' Motion is GRANTED, the

Commissioner's Motion is DENIED, and the matter is remanded for further proceedings.

## II. BACKGROUND

### A.  Procedural History

On May 30, 2017, Ms. Morris, V.V.'s legal guardian and maternal aunt, filed an application

for SSI benefits on V.V.'s behalf (the "Application"), claiming that V.V.'s autoimmune

neutropenia[1] and Tetralogy of Fallot[2] rendered her disabled since her birth in 2013.  (SSA

Administrative Record ("R.") 66, 135–43 (ECF No. 14)).  On July 12, 2017, the SSA denied the

Application.  (R. 66–73, 75–80).  Ms. Morris requested a hearing before an ALJ.  (R. 81–83).  On

March 21, 2019, ALJ Theodore Kim conducted a videoconference from Falls Church, Virginia.  (R.

43–65 (the "Hearing")).  Mr. Morris and V.V. participated from New York, New York, and were

represented by counsel.  (R. 44–46).  On June 14, 2019, ALJ Kim issued his Decision finding that

V.V. was not disabled under the Act.  (R. 6–30).  The ALJ Decision became the final decision of the

Commissioner when the SSA Appeals Council denied Ms. Morris' request for review on July 6,

2020.  (R. 1–5); see 20 C.F.R. § 404.981.

---

[1] "Neutropenia is an abnormally low count of neutrophils, a type of white blood cell that helps fight off
infections, particularly those caused by bacteria and fungi."  Cook v. Colvin, No. 13 Civ. 1946 (TPG), 2015
WL 5155720, at *3 (S.D.N.Y. Sept. 2, 2015).

[2] Tetralogy of Fallot is a congenital birth defect that "happens when a baby's heart does not form correctly
as the baby grows and develops in the mother's womb during pregnancy."  Facts about Tetralogy of Fallot,
CENTERS          FOR          DISEASE          CONTROL          AND          PREVENTION,
https://www.cdc.gov/ncbddd/heartdefects/tetralogyoffallot.html (last visited Jan. 31, 2022).  It "is made
up of the following four defects of the heart and its blood vessels: 1. A hole in the wall between the two
lower chambers—or ventricles—of the heart[;] . . . 2. A narrowing of the pulmonary valve and main
pulmonary artery[;] . . . 3. The aortic valve, which opens to the aorta, is enlarged and seems to open from
both ventricles, rather than from the left ventricle only, as in a normal heart[; and] . . . 4. The muscular
wall of the lower right chamber of the heart (right ventricle) is thicker than normal."  (Id.)

B.  **Factual Background**

V.V. was born in 2013 and was a "preschool child" on May 30, 2017, the date the Application was filed.  (R. 66).[3]  At the time of the Hearing in March 2019, V.V. was five years old and lived with Ms. Morris, who had obtained "full custody" of V.V. in 2017.  (R. 50, 54).  V.V. was in kindergarten, which Ms. Morris described as "age appropriate."  (R. 54).  At the Hearing, Ms. Morris testified that V.V.'s Tetralogy of Fallot and neutropenia diagnoses had become less "concerning" since 2017, and that V.V.'s recently diagnosed attention deficit hyperactivity disorder ("ADHD") and autism spectrum disorder ("ASD") were now the primary bases for the Application.  (R. 55–58).

The Record contains both medical and non-medical evidence, with the latter primarily comprising V.V.'s education records.  (R. 205–1295).  The parties have each submitted summaries of the Record evidence, which are largely consistent.  (ECF Nos. 24 at 6–12; 30 at 11–20).  Ms. Morris did not summarize V.V.'s medical records relating to her heart and autoimmune conditions, "because she does not contend that V.V.'s physical impairments, which had largely resolved by the time of the SSI application, were a source of continuing disability."  (ECF No. 30 at 14).

The Court summarizes the Record evidence relevant to the ALJ Decision and the Court's review.

---

[3] "Preschool children" are those from "age 3 to attainment of age 6."  20 C.F.R. § 416.926a(g)(2)(iii).

1.  **Medical evidence**

    a.  **Tetralogy of Fallot and neutropenia**

On February 13, 2014, V.V began treating with Sarika Kalantre, M.D., a pediatric cardiologist affiliated with the Montefiore Medical Group ("Montefiore").    (R. 223). Dr. Kalantare's notes indicate that V.V. was diagnosed with congenital heart disease, i.e., Tetralogy of Fallot, and neutropenia.  (See R. 289).  Dr. Kalantre's treatment began after V.V. underwent "[v]entricular septal defect closure" and "[t]ransannular patching" procedures to treat her heart condition.  (R. 289).

On May 26, 2015, V.V. saw Marina Reznik, M.D., a Montefiore-affiliated pediatrician. (R. 224).  Dr. Reznik opined that, "[d]ue to her autoimmune neutropenia[,]" V.V. "should not be in day care with other children" and "should also not use public transportation" in order "to avoid exposure to viruses and bacteria common to those settings."  (R. 224). Dr. Reznik's treatment notes indicate that, in March 2017, a blood test showed V.V. was no longer neutropenic.  (R. 562). Subsequent records from September 2018, December 2018, and February 2019 reflect that V.V.'s neutropenia was "resolved."  (R. 1129, 1185, 1213).

    b.  **Mental Impairments**

        i.  **Montefiore**

Between March 2016 and August 2017, V.V. also treated at Montefiore for mental conditions.  Specifically, on March 29, 2016, V.V. was enrolled in Montefiore's "Healthy Steps Intensive Services due to [her] family experiencing [a] range of psychological stressors."  (R. 273–86).  Treatment notes indicate that both of V.V.'s biological parents were incarcerated at various times, and that her mother had a history of substance abuse and homelessness.  (See R. 210, 216,

275, 350, 443, 512–13).   As part of the Healthy Steps program, V.V met with pediatric psychologists and behavioral health specialists, including Kate Cuno, Psy.D., Elizabeth Ward, Ph.D., and Tamar Kairy, Ph.D., to assess and manage her behavior.  (See, e.g., R. 216, 276, 282, 344, 443, 512, 522).

On August 14, 2017, Ms. Morris reported to Dr. Cuno that V.V. was "impulsive, at times sneaky, and ha[d] difficulty listening when being told something she d[id] not want to hear." (R. 513).  On August 28, 2018, R. Cuno noted that V.V.'s "[d]ifficult behavior persists."  (R. 526). Dr. Cuno discussed a "possible preventive services referral," including "long-term outpatient dyadic therapy."  (R. 527).

### ii.   S. Gandhi – State Agency Consultant

Contained in the Commissioner's July 12, 2017 initial-level Disability Determination Explanation is a consultative assessment of V.V.'s functioning by S. Gandhi, M.D.  (R. 68–71)). Dr. Gandhi evaluated V.V.'s functioning in terms of the six "domains" that the Commissioner uses to assess childhood disability: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for herself; and (vi) health and physical well-being.  (R. 69).  Based on his review of V.V's medical records, Dr. Gandhi opined that V.V. had no limitations in acquiring and using information, attending and completing tasks, and moving about and manipulating objects, and less-than-marked limitations in interacting with others, caring for herself, and health and physical well-being.  (R. 69).

### iii.  **Susan Santarpia, Ph.D. – SSA Consultative Examiner**

On April 23, 2019, i.e., after the Hearing and at the request of the SSA, Susan Santarpia,
Ph.D., conducted a consultative psychiatric examination (the "Post-Hearing CE") of V.V.  (R. 1290–
95 ("Dr. Santarpia's Report")).  Dr. Santarpia observed that V.V. "present[ed] as very social, [and]
very engaged in communication."  (R. 1291).  With respect to V.V.'s "[a]ttention, concentration,
and hyperactivity symptoms[,]" Dr. Santarpia noted that V.V. "present[ed] with excessive motor
behavior, impulsivity, fidgeting and squirming, [was] easily distracted, and [had] difficulty
sustaining attention."  (R. 1292).  Dr. Santarpia also noted that V.V.'s attention and concentration
were "intact" because she "could do mathematical counting and calculation appropriate for [her]
age and grade."  (R. 1293).  Dr. Santarpia was aware that V.V. was receiving "special education
services" at the time of the CE, and was provided with a copy of V.V.'s individualized education
program ("IEP").  (R. 1291).

With respect to V.V.'s recent and remote memory skills, Dr. Santarpia noted that she
"could recall 3 of 3 objects immediately, [and] 2 of 3 objects after delay" and "could recite 5 digits
forward."  (R. 1293–94).  Dr. Santarpia also observed V.V.'s cognitive functioning to be "in the
average range of ability."  (R. 1294).

Under the heading "Medical Source Statement," Dr. Santarpia opined:

[V.V.] presents as able to attend to, follow, and understand age-appropriate
directions; sustain concentration and complete age-appropriate tasks; adequately
maintain appropriate social behavior; respond appropriately to changes in the
environment; learn in accordance to cognitive functioning; ask questions and
request assistance in an age-appropriate manner; be aware of danger and take
needed precautions; interact adequately with peers; and interact adequately with
adults within normal limits.  The results of the present evaluation appear to be
consistent with psychiatric problems, but in and of itself, this does not appear to
be significant enough to interfere with [V.V.]'s ability to function as a child/student
on a daily basis.

(R. 1294–95).  Under the heading "Diagnosis," Dr. Santarpia wrote:

> Attention deficit hyperactivity disorder, combined type.
> Rule out adjustment disorder with mixed disturbance of emotion and conduct.

(R. 1295).  Dr. Santarpia recommended that Ms. Morris "[c]onsider [a] referral for psychological/psychiatric treatment," and that V.V. "[c]ontinue with [her] current educational placement."  (R. 1295).

### 2.  Non-medical evidence

#### a.  The Function Report

On June 30, 2017, Ms. Morris completed a function report as part of the Application. (R. 150–57 (the "Function Report")).  Ms. Morris claimed that V.V's ability to communicate was limited and that she did not converse with other children.  (R. 153).  Ms. Morris noted, however, that V.V.: (i) asked what, why, and where questions; (ii) used complete sentences of more than four words most of the time; (iii) talked about what she was doing; (iv) asked for what she wanted; (v) recounted activities that happened in the past; (vi) was able to tell a made-up or familiar short story; and (vii) could deliver simple messages such as a telephone message. (R. 153).  Ms. Morris reported that V.V. had difficulty controlling her bowels and bladder during the day and was unable to wash or bathe herself without help, but that she was able to dress herself.  (R. 156).  Ms. Morris also claimed that V.V.'s impairments limited her ability "to pay attention and stick with a task," and that she could pay attention for 15 minutes.  (R. 156).

#### b.  School records and related evaluations

On August 29, 2018, Marilyn Sentmanat, a social worker with the New York City Department of Education ("DOE"), conducted a "Social History Evaluation" of V.V. at Ms. Morris' request to determine whether V.V. required special education services.  (R. 1030–32).

Ms. Sentmanat noted that V.V. "began her school career at Success Academy Charter School, Washington Heights on August 20, 2018[,]" and that, "[s]ince then (9 days ago), she has been suspended three times."  (R. 1031).  "According to the school suspension letters," the bases for each suspension were:

> August 21, 2018 - 1 Day Suspension - [V.V.] engaged in unsafe behavior by pushing peers; unsafe behavior by crawling and rolling on the floor; and disrespectful behavior by yelling "no" at her teachers.
>
> August 23, 2018 - 3 Days Suspension - [V.V.] engaged in unsafe behavior by crawling, running, and sliding up and down the hallway; unsafe behavior by running away from staff; disruptive behavior by yelling at staff; unsafe behavior by throwing her shoes; and disrespectful and unsafe behavior by not following directions.
>
> August 27, 2018 - 5 Days Suspension - Ms. Morris has been informed by the school of the suspension but has not yet received the actual suspension letter.

(R. 1031).

On August 29, 2018, Erica Diaz, a school psychologist, conducted a psychoeducational evaluation of V.V.  (R. 1039–45).  Ms. Diaz noted that, "[i]nitially during testing, [V.V.] followed the evaluator's instructions and attempted tasks."  (R. 1039).  "However, as testing continued[,] she demonstrated difficulty following instructions and focusing on tasks[,]" and she "frequently needed movement breaks and redirection."  (R. 1039).   Ms. Diaz noted that V.V. "required behavioral prompts throughout the duration of the evaluation[,]" and she opined that "the results of this evaluation may have been impacted by [V.V.]'s difficulty focusing on tasks and following directions."  (R. 1040).   Among other findings, Ms. Diaz found V.V.'s listening comprehension, reading, and math skills to be above average, and her writing skills to be average. (R. 1042).  V.V.'s behavior assessment, however, was indicative of "maladaptive behavior." (R. 1043–44).  Specifically, V.V.'s score on the "Hyperactivity scale" was in the 99th percentile,

and her score on the "Aggression scale" was in the 96th percentile.  (R. 1043–44).  These scores placed her in the "clinically significant range."  (R. 1043).

On September 28, 2018, Wandalee Cruz-Gonzales, a DOE teacher, observed V.V. in an integrated co-teaching ("ICT") class.  (R. 1033).  "When the teacher asked questions, [V.V.] called out twice with the correct answer and was redirected by the teacher to raise her hand."  (R. 1033).  Ms. Cruz-Gonzales noted that V.V. "appeared distracted, at times gazed away, but always knew the answers."  (R. 1033).  During a reading exercise, V.V. "stood up from her seat and walked over to her peer in attempt to take the book, but was redirected back to her seat."  (R. 1033).  V.V. was given a different book, and when she finished it, "she called out 'I'm finished' and continued to call out until the teacher continuously kept her engaged until the rest of the class was done."  (R. 1033).  In a summary of the observation, Ms. Cruz-Gonzales wrote that "V.V. is able to attend to classroom instruction and is able to participate," but that she "calls out, gazes away, and requires a great deal of redirection."  (R. 1033).  Ms. Cruz-Gonzales noted that V.V. "responds to redirection."  (R. 1033).

On October 19, 2018, Danielle Lipman, a speech language pathologist, performed a "Speech/Language Evaluation" of V.V.  (R. 1034–37).  Ms. Lipman noted that, "due to multiple suspensions [at Success Academy], [V.V.] was enrolled al PS 005, where she is presently in a monolingual English ICT kindergarten classroom."  (R. 1034).  Ms. Lipman assessed V.V. to have "intact language comprehension and verbal expression skills in English."  (R. 1035).

On November 2 and November 9, 2018, Erik Moore, Ph.D., performed a neuropsychological evaluation of V.V. at Ms. Morris' request.  (R. 1046–61).  Dr. Moore noted that, "[d]uring the interview, [V.V.] was alert and cooperative[,]" but "[h]er motor behavior was

restless and hyperactive as she was constantly moving and required frequent redirection." (R. 1048).  He noted that V.V.'s "attention and concentration appeared mildly deficient as she was able to complete serial ones down from 10 with pauses."  (R. 1048).  Separately, Dr. Moore noted that "[V.V.]'s aunt and teacher endorsed significant inattention symptoms that included being easily distracted and having focusing and concentration difficulties, and hyperactivity symptoms that included being easily excitable, fidgety, and restless, among others."  (R. 1052). "In addition, both [V.V.]'s aunt and teacher indicated that such symptoms 'seriously affect school work or grades.'"  (R. 1052).  Dr. Moore tested V.V. "on tasks that require focused and sustained attention and concentration[,]" including "repeating and sorting random strings of digits of increasing length backward and forward, scanning and matching symbols, identifying a series of single and double images just viewed within a larger group of images and another timed task to scan and match shapes and additional tasks to list quickly series of numbers, letters, days, and months, forward and backward."  (R. 1052–53).  Dr. Moore noted that "[s]uch tasks required the ability to focus and sustain attention, some under a time limit, and it appeared that [V.V.] was unable to perform such tasks consistently, in an age-appropriate manner even when adequately motivated and in a minimally distracting environment."  (R. 1053).  Dr. Moore opined that the "aforementioned deficiency may interfere with the ability to process academic material efficiently, as such is essential to learning, retaining, and later recalling information, in particular when tasks are afforded a limited time."  (R. 1053).

Under the heading "Summary and Recommendations," Dr. Moore concluded, inter alia, that:

> it appeared that autism disorder symptoms, attention and hyperactivity deficits
> with a presumed neurodevelopmental etiology, behavior, mood and anxiety,

adaptive functioning and social skills difficulties, and family adjustment concerns, might adversely influence downstream cognitive performance and hinder academic progress unless adequately addressed.

(R. 1058–59).   Dr. Moore diagnosed V.V. with: (i) ASD associated with another neurodevelopmental, mental, or behavioral disorder; (ii) ADHD, Combined Presentation; and (iii) adjustment disorder with mixed disturbance of emotions and conduct.   (R. 1059).   He recommended, inter alia, that V.V. undergo neurocognitive remediation to address her "[i]nattention and hyperactivity symptoms."  (R. 1060).

On February 27, 2019, V.V.'s IEP was implemented at P.S. 5.   (R. 1011–29).   The IEP referenced and incorporated Dr. Moore's findings and diagnoses (R. 1011–18), and included recommended special education programs, including ICT and counseling services.   (R. 1023). Under the heading "Present Levels of Performance and Individual Needs," the IEP indicates:

> Although [V.V.] has an average [Full-Scale Intelligence Quotient,] her processing speed and working memory abilities are within the low average range as demonstrated by her difficulty to focus and sustain attention and concentration which may interfere with her ability to process academic material efficiently. Despite [V.V.] performing on grade level and having cognitive potential, she has not made much progress in reading since the beginning of the school year due to social-emotional and social skills delays and needs which interfere with her ability to follow instructions without one-to-one assistance.  . . . [V.V.] was referred as a candidate for the NEST program.  However, while she remains at PS 5, she will receive instruction in an [ICT] class along with speech and language therapy, occupational therapy, counseling, and a full-time behavior support paraprofessional.

(R. 1018).

### 3.  **Hearing before the ALJ**

On March 21, 2019, ALJ Kim conducted the Hearing, at which Ms. Morris and V.V. were represented by an attorney, Miriam Hurwitz.  (R. 44).  At the start of the Hearing, ALJ Kim asked Ms. Hurwitz whether she "consider[ed] the record complete[.]"  (R. 47).  Ms. Hurwitz requested

that the record remain open for 60 days because she had "request[ed] updated Montefiore records, although [she was] not sure how much new there [was] other than what [the ALJ] had already gotten." (R. 47; see R. 197 (March 13, 2019 letter from Ms. Hurwitz to ALJ Kim). ALJ Kim agreed to "hold the record open . . . until May 21, [2019]." (R. 48).[4]

V.V. testified at the Hearing. (R. 50–52). She answered basic questions about her name, age, and home. (R. 50). She testified that she had five friends, and that her favorite school subject was "pizza." (R. 51).

The ALJ then questioned Ms. Morris. (R. 53). Ms. Morris confirmed V.V.'s birthday and ADHD and ASD diagnoses. (R. 54). When asked "[w]hy are we here today," Ms. Morris recounted V.V.'s neutropenia and Tetralogy of Fallot conditions. (R. 54–57). At that point, the ALJ invited Ms. Hurwitz to question Ms. Morris. (R. 57). Ms. Morris testified about the limitations and issues caused by V.V.'s ADHD and ASD, including that V.V. "has no impulse control," "has to be kept on task all the time," and is "bad with attention." (R. 57–58). Ms. Morris discussed V.V.'s prior school suspensions at Success Academy, and that she was assigned a "crisis para" at P.S. 5. (R. 60). Ms. Morris acknowledged that V.V. is "very smart," but testified that she had "trouble progressing in school" and was "inhibiting the children around her" as a result of her behavioral issues. (R. 61). Ms. Morris confirmed that, without one-on-one attention, V.V. is "not able to focus." (R. 63).

---

[4] The ALJ Decision reflects that, after the Hearing, the Commissioner received 208 pages of records from Montefiore, covering the period November 3, 2017 to March 19, 2019, which the ALJ admitted into the record. (R. 30; see R. 9, 1082–1289).

### 4.   **The Post-Hearing CE**

On April 23, 2019, at ALJ Kim's request, Dr. Santarpia conducted the Post-Hearing CE. (R. 1290–95; see § II.B.1.a.iii supra).  By letter dated May 15, 2019, ALJ Kim notified Ms. Morris of Dr. Santarpia's Report and advised that he "propose[d] to enter [it] into the record."  (R. 199–200).  ALJ Kim invited Ms. Morris to submit "written comments concerning the [Report], a written statement as to the facts and law you believe apply to the case in light of [the Report], and any additional records you wish me to consider[,]" as well as "written questions to be to" Dr. Santarpia.  (R. 199).  ALJ Kim also advised Ms. Morris of her ability to request a supplemental hearing.  (R. 199).

By letter dated May 23, 2019, Ms. Hurwitz responded that Dr. Santarpia's Report was "inconsistent with the record as a whole and should be discounted."  (R. 202–04).

### 5.   **The ALJ Decision and Appeals Council Review**

On June 14, 2019, ALJ Kim issued his Decision denying V.V.'s Application for SSI benefits. (R. 9–27).  He held that, "[a]fter careful consideration of all of the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since May 30, 2017, the date the application was filed."  (R. 10).

ALJ Kim first determined that V.V. was a "preschooler" on the dates of the Application and the Decision.  (R. 12).  He then proceeded to the three-step child disability determination process.  At step one, ALJ Kim found that V.V. had not engaged in substantial gainful activity since the Application.  (R. 12).  At step two, the ALJ found that V.V. had four severe impairments: (i) autoimmune neutropenia; (ii) ASD; (iii) ADHD; and (iv) adjustment disorder.  (R. 12).

At step three, the ALJ found that V.V. did not have an impairment or combination of impairments that met or medically equaled one of the Listings.  (R. 12–16).  Specifically, ALJ Kim determined that "the severity of [V.V.]'s impairments, considered singly and in combination, does not meet or medically equal the criteria of any impairments listed in 112.02 [neurocognitive disorders], 112.10 [autism spectrum disorder], 112.11 [neurodevelopment disorders], and 114.07 [immune deficiency disorders, excluding HIV infection]."  (R. 13).

ALJ Kim determined that V.V.'s ADHD did not meet Listing 112.02 because there was  no evidence that V.V. had: "(A) a significant cognitive decline in cognitive attention, executive function, learning and memory, language, perceptual-motor, or social cognition; and (B) an extreme limitation on one or two marked limitations in (1) understanding, remembering, or applying information, (2) interacting with others, (3) maintaining concentration, persistence, or pace, (4) adapting or managing oneself; or (C) A serious and persistent mental disorder which has lasted for at least two years, and (1) the claimant has lived in a highly structured environment and (2) there has been marginal adjustment in the ability to adapt to changes or demands that are not already part of daily life."  (R. 13).

Next, the ALJ determined that V.V.'s ASD did not meet or equal Listing 112.10 "because there are no qualitative defects in verbal communication, nonverbal communication and social interaction, AND significantly restricted, repetitive patterns of behavior, interest[s] or activities." (R. 13).  The ALJ also determined that "there is no extreme or marked limitation of two of the following: understand, remember or apply information, interact with others, concentrate, persist or maintain pace and adapt or manage oneself."  (R. 13).

Finally, ALJ Kim determined that "[t]he severity of the [V.V.]'s impairment [did] not meet or medically equal the criteria of any impairment listed in Listing 112.11." (R. 13). The ALJ noted that "[t]his listing requires medical documentation of one or both of the following: frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being 'driven by a motor'); significant difficulties learning and using academic skills; or recurrent motor movement or vocalization[,]" as well as "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." (R. 13).

With respect to Listing 112.11, ALJ Kim determined that the "evidence shows [V.V.] has just one marked limitation in the areas of mental functioning" set forth in that Listing (R. 16), specifically in the area of "interacting with others." (R. 14). In reaching that conclusion, the ALJ summarized Record evidence as it related to each area of mental functioning. (R. 13–16).

ALJ Kim concluded that "for understanding, remembering, or applying information, [V.V.] has mild limitation." (R. 13). The ALJ noted, inter alia, that V.V's Function Report indicated that she "had no problems seeing, hearing, or talking[,]" but that she was limited in her ability to "identify[] colors and shapes, ask[] what words [mean] or defin[e] them, understand[] jokes, and know[] her birthday and her phone number." (R. 13–14 (citing R. 151–52, 154)). The ALJ also noted that Hearing testimony "made clear that [V.V.] is age appropriate for her grade, and that she is believed to be very smart, but has trouble progressing due to her behavior and class disruption, causing her to regress." (R. 14). ALJ Kim noted that V.V. "scored average in a full-

scale IQ test," and "was generally above average in academic functioning."  (R. 14 (citing (R. 1040–42)).  Similarly, the ALJ noted that, while "[h]er attention and concentration and memory skills appeared mildly deficient," V.V.'s "insight and judgment were age appropriate, and her academic achievement ranged from average to superior."  (R. 14 (citing R. 1048, 1058)).  Likewise, "[t]hough her listening comprehension, oral expression, and numerical operations were low to average, [V.V.'s] early reading skills and spelling were high average to superior."  (R. 14 (citing R. 1056)).  In addition, ALJ Kim noted that Dr. Santarpia found that V.V.'s "recent and remote memory were intact," "she could recall 3/3 objects immediately and 2/3 after delay, and recite 5 digits forward[,]" and  that she "had cognitive functioning in the average range, an appropriate fund of information, and appropriate insight and judgment."  (R. 14 (citing R. 1293– 94)).  Based on this evidence, the ALJ determined that V.V.'s "difficulty in this area is no more than mild."  (R. 14).

As noted above, ALJ Kim found that "[t]he record shows [V.V.] has a marked limitation in interacting with others."  (R. 14).  The ALJ noted, inter alia, that, according to her Function Report, V.V. "had issues taking part in conversations with other children" and "limitations related to her behavior with other people, such as playing pretend or games, including board games and active games, with other children."  (R. 14 (citing R. 153, 155)).  The ALJ also referenced Hearing testimony and Record evidence indicating that V.V. "was suspended from school three times in four days, and was subsequently determined to have ADHD and autism and moved to a special school[,]" and that V.V. "has no impulse control, needs one on one attention, has crisis with changing patterns or routines, trouble maintaining friendships, and has acted violently and/or sexually."  (R. 14 (citing R. 1031, 1043–44, 1047–48, 1059, 1295)).  The ALJ also noted, however,

that "[i]n evaluations, [V.V.] was alert and cooperative and [she] presented as very social and engaged in communication[,]" and that she "did not present with any social deficits[.]"  (R. 14 (citing R. 1048, 1292)).  Similarly, V.V. "reportedly got along well with peers, was very social, and had a good relationship with [Ms. Morris,] and "was reported able to play with friends, do sports, dancing, and singing, and go to the aquarium, museums, and the zoo."  (R. 14 (citing R. 1292, 1295)).  ALJ Kim concluded that "[V.V.'s] difficulty in this area is no more than marked."  (R. 14).

In the mental-functioning area of "concentrating, persisting, or maintaining pace," ALJ Kim determined that V.V. "has only a mild limitation."  (R. 14).  In reaching this conclusion, ALJ Kim summarized significant Record evidence reflecting V.V's limited attention and impulse control, which he then contrasted primarily with Dr. Santarpia's observations at the Post-Hearing CE.  Specifically, the ALJ noted that V.V.'s Function Report "indicated that [she] had issues paying attention and sticking with a task, marking that she could pay attention for 15 minutes." (R. 15 (citing R. 156)).  The ALJ referenced testimonial and Record evidence indicating that V.V. "was suspended from school three times in four days, and that she has no impulse control, needs one on one attention, has crisis with changing patterns or routines, and must be kept on task." (R. 15).  ALJ Kim noted, that, while V.V. "is believed to be very smart" and "was generally above average in academic functioning[,]" she "had measures of over-activity and restlessness" during psychiatric evaluations.  (R. 15 (citing R. 1041–44)).  The ALJ also acknowledged that V.V "was restless and hyperactive, and required frequent redirection in one exam, and her attention and concentration and memory skills appeared mildly deficient, likely due to inattentiveness, and she required repetition of instructions, and her attention and concentration fluctuated with distractibility."  (R. 15 (citing R. 1048)).  Without acknowledging him by name, the ALJ noted Dr.

Moore's diagnoses of ADHD, ASD, and adjustment disorder (R. 15 (citing R. 1059)).  The ALJ also noted Dr. Santarpia's observation that V.V. "presented with excessive motor behavior, impulsivity, fidgeting, and was easily distracted and had difficulty sustaining attention."  (R. 15 (citing R. 1291)).  On the contrary, ALJ Kim noted that Dr. Santarpia found V.V.'s attention and concentration to be "intact" because "she could do mathematical counting and calculation appropriate for her age and grade" (R. 15 (citing R. 1293)), and that V.V.'s "recent and remote memory were also intact, and she could recall 3/3 objects immediately and 2/3 after delay, and recite 5 digits forward."  (R. 15 (citing R. 1293–94)).  Without any analysis or further discussion, ALJ concluded that V.V.'s difficulty in this area is "no more than mild."  (R. 15).

Finally, ALJ Kim determined that "in terms of adapting and managing oneself, [V.V.] has less than mild limitations."  (R. 15).  In reaching this conclusion, the ALJ again cited significant Record evidence tending to suggest a marked limitation in this area, which he then contrasted with Dr. Santarpia's observations.  (R. 15).  He cited V.V.'s "issues with habits and ability for personal care that include bladder control, eating using utensils, dressing, washing or bathing, brushing her teeth, and putting toys away[,]" as reflected in the Function Report.  (R. 17 (citing R. 156)).  The ALJ also noted Ms. Morris' Hearing testimony, in which she "described [V.V.] as having has no impulse control, that she has crisis with changing patterns or routines, and as having acted violently and/or sexually."  (R. 15).  The ALJ again acknowledged V.V.'s ADHD, ASD, and adjustment disorder diagnoses, and her "behavioral difficulties such as loss of temper, defiance, aggressiveness towards peers, throwing objects, and biting clothing."  (R. 15 (citing R. 1047)).  In contrast to this evidence, the ALJ noted that, at the Post-Hearing CE, V.V "appeared well groomed and had intelligible and fluent speech, coherent and goal directed thought

processes, and a full and appropriate range of affect," (R. 15 (citing R. 1293)), and that she "was reported able to dress and groom herself, help with chores, get snacks, do her homework, play with friends, do sports, dancing, and singing, and go to the aquarium, museums, and the zoo." (R. 15–16 (citing R. 1295)).  ALJ Kim concluded that V.V.'s "difficulty in this area is no more than mild."  (R. 16).

Next, the ALJ determined that V.V. "does not have an impairment or combination of impairments that functionally equals the severity of the listings."  (R. 16).  Within this analysis, ALJ Kim discussed "the opinion evidence."  (R. 19–20).  Specifically, the ALJ weighed Dr. Reznik's May 2015 opinion that, due to her "autoimmune neutropenia and [T]etralogy of [F]allot diagnoses, [V.V.] should not use public transportation, nor be in day care with other children to avoid exposure to viruses and bacteria common to those settings[,]" and her February 2016 opinion that V.V. "should avoid visiting her mother in jail for similar reasons."  (R. 19).  ALJ Kim found that "these opinions are somewhat persuasive and consistent with the medical evidence in this case."  (R. 19).  Similarly, the ALJ found "partially persuasive" Dr. Gandhi's July 2017 opinion that V.V. "had less than marked limitations in caring for herself, and in health and physical well-being, with no limitations in the remaining domains."  (R. 19–20).  ALJ Kim found Dr. Gandhi's opinion to be "supported by the record as a whole, including records created preceding Dr. Gandhi's determination."  (R. 20).  Finally, ALJ Kim found Dr. Santarpia's opinions in her Report to be "somewhat persuasive and consistent with the medical evidence in this case."  (R. 20).

ALJ Kim then turned to V.V.'s limitations in the six domains of child functioning.  (R. 20).  The Court notes that, aside from briefly describing each domain, the ALJ's analysis was copied verbatim from his analysis of V.V.'s mental functioning limitations under Listing 112.11(B).

(<u>Compare</u> R. 13–16 <u>with</u> R. 21–26).  ALJ Kim determined that V.V. has no limitation in the domain of acquiring and using information, and then repeated the same evidence on which he had determined that she had a mild limitation in understanding, remembering, or applying information.  (R. 21).  Similarly, for the same reasons that he found mild limitations in concentrating, persisting, or maintaining pace and in adapting and managing oneself under Listing 112.11(B), the ALJ found that V.V. has a less than marked limitation in the domains of attending and completing tasks and caring for herself.  (R. 23).  ALJ Kim again found that V.V. has a marked limitation in the domain of interacting and relating with others, and then cited the same evidence as he did under Listing 112.11.  (R. 23).  The only new analysis in this section concerned the domains of moving about and manipulating objects, for which he determined V.V. has no limitation, and health and physical well-being, for which he found V.V. has a less than marked limitation.  (R. 24–27).

Accordingly, having found no "extreme" limitations and only one "marked" limitation in the six domains, the ALJ determined that V.V. was not disabled.  (R. 27).

On July 6, 2020, the Appeals Council denied Ms. Morris' request for review of the ALJ Decision.  (R. 1–5).

### III. LEGAL STANDARDS

#### A.  Standard of Review

Under Federal Rule of Civil Procedure 12(c), a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to

judgment as a matter of law.  Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  (Id.)  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the

Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. § 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 416.920b.

"An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case."  Lent v. Comm'r of Soc. Sec., No. 19 Civ. 1127 (ER) (RWL), 2020 WL 1516466, at *5 (S.D.N.Y. Mar. 3, 2020) (citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008)). "This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ('SSR')." Salerno v. Berryhill, No. 19 Civ. 627, 2020 WL 882006, *2 (S.D.N.Y. Feb. 24, 2020) (citing Kohler, 546 F.3d at 265); see Lent, 2020 WL 1516466, at *5 (same); Quintana v. Berryhill, No. 18 Civ. 561 (KHP), 2019 WL 1254663, at *7 (S.D.N.Y. March 19, 2019) (same).  "In such a case, the court may remand the matter to the

Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning." Quintana, 2019 WL 1254663, at *7.

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so, he must address all pertinent evidence. An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act authorizes a court, when reviewing the Commissioner's decisions, to order further proceedings: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

B.  **Eligibility for Benefits**

For purposes of SSI benefits, a child (<u>i.e.</u>, a person under the age of 18) is disabled within

the meaning of the Act, and thus entitled to such benefits, when the child has "a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  To

assess whether a child claimant qualifies for SSI, the ALJ must conduct a three-step sequential

inquiry.  <u>See</u> <u>Pollard v. Halter</u>, 377 F. 3d 183, 189 (2d Cir. 2004).  If it is determined that a claimant

is not disabled at any step in the evaluation process, the ALJ does not continue to the next step.

At step one, the ALJ must find that the claimant is not engaged in any "substantial gainful

activity."  20 C.F.R. § 416.924(b) ("If you are working and the work you are doing is substantial

gainful activity, we will find that you are not disabled regardless of your medical condition or age,

education, or work experience.").  At step two, the ALJ must determine whether the child has a

medically determinable severe impairment, <u>i.e.</u>, an impairment or combination of impairments

"that causes . . . more than minimum functional limitations."  <u>Id.</u> § 416.924(c).  Finally, at the third

step, the ALJ must assess whether the child has an impairment or combination of impairments

that meets, medically equals, or functionally equals one of the impairments in the "Listings."  <u>Id.</u>

§ 416.924(d).  (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as

the "Listings").  A Listing is met when the impairment directly satisfies the criteria contained in

the Listing § 416.924(d), and an impairment medically equals a Listing "if it is at least equal in severity and duration to the criteria of any listed impairment." Id. § 416.926(a).

If a child's impairments do not meet or are not the medical equivalent of any of the Listings, the ALJ must then proceed to step three to consider whether the child's impairment is nevertheless "functionally equal" to a Listing. 20 C.F.R. § 416.926a(a). Impairments are functionally equivalent to a Listing when they result in two "marked"[5] or one "extreme"[6] limitation in two of the six delineated domains of child functioning. Id. The six domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. § 416.926a(b)(1)(i)–(vi).

### C. Considerations in Determining Disability for Children

SSR 09-1p "explains the standards employed to determine whether a child's impairment(s) functionally equals the listings." Lent, 2020 WL 1516466, at *8 (citing SSR 09-1p, 2009 WL 396031 at *1). "Described as the 'whole child' approach, SSR 09-1p provides that functional equivalence determinations start with 'considering the child's functioning without considering the domains or individual impairments' and, in light of the case record, evaluating

---

[5] A limitation is "marked" when it "interferes seriously with [the child's] ability to independently initiate, sustain or complete activities" and "is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). For the sixth functional domain, "health and physical well-being," a marked limitation is found where the child's impairments cause frequent illness or where the child has "frequent exacerbations of . . . impairment(s) that result in significant, documented symptoms or signs." Id. § 416.926a(e)(2)(iv).

[6] A limitation is "extreme" when it is "more than marked," and "interferes very seriously with [the child's] ability to independently initiate, sustain or complete activities," such as those demonstrated by "standardized testing . . . scores that are at least three standard deviations below the mean. Id. § 416.926a(e)(3)(i). This is the rating given to the worst limitations. Id.

how a child's 'functioning is affected during all . . . activities' including everything done at home, school, and in the community." Id. (quoting SSR 09-1p, 2009 WL 396031 at *1). "Once the ALJ determines that a child's activities are 'limited' in some way, they must 'determine which domains are involved in those activities' to determine whether the identified impairments 'could affect those domains and account for the limitations.'" Id. (quoting SSR 09-1p, 2009 WL 396031 at *2). "Only after that will the ALJ 'rate the severity of the limitations in each affected domain' to determine whether the child is 'disabled' as defined in the Act." Id. (quoting SSR 09-1p, 2009 WL 396031 at *2). "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." SSR 09-1p, 2009 WL 396031 at *2.

The Commissioner's regulations set forth the factors an ALJ will consider in evaluating the effects of a child's impairment(s) on his or her functioning. 20 C.F.R. § 416.924a(b). These factors include, inter alia, "[h]ow well [the child] can initiate, sustain, and complete [his or her] activities, including the amount of help or adaptations [the child] need[s], and the effects of structured or supportive settings." Id. § 416.924a(b)(5). Specifically, the regulations provide:

> [The Commissioner] will consider how effectively you function by examining how independently you are able to initiate, sustain, and complete your activities despite your impairment(s), compared to other children your age who do not have impairments. We will consider:
>
> (A) The range of activities you do;
>
> (B) Your ability to do them independently, including any prompting you may need to begin, carry through, and complete your activities;
>
> (C) The pace at which you do your activities;

(D) How much effort you need to make to do your activities; and

(E) How long you are able to sustain your activities.

20 C.F.R. § 416.924a(b)(5)(i).  The Commissioner's regulations recognize that "[a] structured or

supportive setting may minimize signs and symptoms of [a claimant's] impairment(s) and help to

improve [a claimant's] functioning while [he or she is] in it, but [the claimant's] signs, symptoms,

and functional limitations may worsen outside this type of setting."  Id. § 416.924a(b)(5)(iv)(C).

"Therefore, [the Commissioner] will consider [the claimant's] need for a structured setting and

the degree of limitation in functioning [the claimant has] or would have outside the structured

setting."  Id.  "Even if [a claimant is] able to function adequately in the structured or supportive

setting, [the Commissioner] must consider how [the claimant] function[s] in other settings and

whether [the claimant] would continue to function at an adequate level without the structured

or supportive setting."  Id.

The Commissioner also recognizes that "[c]hildren may function differently in unfamiliar

or one-to-one settings than they do in their usual settings at home, at school, in childcare or in

the community."  20 C.F.R. § 416.924a(b)(6).  Accordingly, the regulations provide:

> You may appear more or less impaired on a single examination (such as a
> consultative examination) than indicated by the information covering a longer
> period. Therefore, we will apply the guidance in paragraph (b)(5) of this section
> when we consider how you function in an unusual or one-to-one situation. We
> will look at your performance in a special situation and at your typical day-to-day
> functioning in routine situations. We will not draw inferences about your
> functioning in other situations based only on how you function in a one-to-one,
> new, or unusual situation.

Id.

Similarly, SSR 09-2p "explains the evidence [the Commissioner] need[s] to document a

child's impairment-related limitations, the sources of evidence [the Commissioner] commonly

see[s] in childhood disability cases, how [the Commissioner] consider[s] the evidence we receive from early intervention and school programs (including special education), how [the Commissioner] address[es] inconsistencies in the evidence, and other issues related to the development of evidence about functioning." SSR 09-2p, 2009 WL 396032, at *2.  With respect to addressing inconsistencies in the evidence, SSR 09-2p notes that "an apparent inconsistency may not be a true inconsistency[,]" and provides the following illustration:

> For example, the record for a child with attention-deficit/hyperactivity disorder (AD/HD) may include good, longitudinal evidence of hyperactivity at home and in the classroom, but show a lack of hyperactivity during a CE.  While this may appear to be an inconsistency, it is a well-known clinical phenomenon that children with some impairments (for example, AD/HD) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a CE.

Id. at *12 (citing 20 C.F.R. 416.924a(b)(6)).  In the Commissioner's own words:

> This example highlights the importance of getting a full picture of the "whole child" and of our longstanding policy that we must consider each piece of evidence in the context of the remainder of the case record.  Accepting the observation of the child's behavior or performance in an unusual setting, like a CE, without considering the rest of the evidence could lead to an erroneous conclusion about the child's overall functioning.

Id. at *12 n.24.

## IV. DISCUSSION

The ALJ evaluated V.V.'s claim pursuant to the three-step sequential evaluation process applicable to child disability claims, and concluded that she was not disabled within the meaning of the Act as of her alleged onset date.  (R. 27).  The Court finds that ALJ Kim failed to properly evaluate whether V.V.'s mental impairments functionally equal one of the Listings, and that remand for further proceedings is therefore warranted.

### A.  **The Parties' Arguments**

#### 1.  **The Commissioner's Motion**

Because Ms. Morris was <u>pro se</u> when she filed the Complaint (<u>see</u> ECF No. 2), the Commissioner filed her Motion first.  (ECF No. 23; <u>see</u> ECF No. 3).  The Commissioner argues that the ALJ Decision "is supported by substantial evidence and should be affirmed."  (ECF No. 24 at 13 (capitalization omitted)).  In particular, the Commissioner advances two arguments: (i) ALJ Kim's determination that V.V.'s impairments did not meet a Listing is supported by substantial evidence; and (ii) ALJ Kim's determination that V.V.'s impairments did not functionally equal a Listing is supported by substantial evidence.  (<u>Id.</u> at 20–30).  As to meeting the Listings, the Commissioner argues that "[t]he ALJ reasonably found that V.V.'s immune disorder did not meet Listing 114.07 (immune deficiency disorders), as there is no record evidence that she had experienced any of the infections or the stem cell transplantation required by the Listing."  (<u>Id.</u> at 20).  With respect to V.V.'s mental impairments, the Commissioner argues that the ALJ reasonably concluded that V.V.'s ADHD, adjustment disorder, and autism did not meet "the requirements of Listings §§ 112.02, 112.06, 112.10, or 112.11."  (<u>Id.</u> at 20–24).[7]

#### 2.  **Ms. Morris' Motion**

Ms. Morris challenges the ALJ Decision on three grounds: (i) ALJ Kim erred by creating his own functional assessment not based on expert medical opinion; (ii) ALJ Kim's failure to secure needed medical opinion evidence constituted a violation of the Commissioner's duty to develop

---

[7] Although the Commissioner argues that V.V.'s mental impairments did not meet Listing 112.06 (ECF No. 24 at 20–24), the ALJ did not consider this Listing in reaching his Decision, and Ms. Morris does not argue that he should have.  (<u>See</u> R. 9–27; ECF Nos. 30, 34).  Accordingly, the Court does not consider the Commissioner's argument on that point.

the record; and (iii) ALJ Kim violated the requirement to explain which evidence he relied on and why he found it persuasive.  (ECF No. 30 at 20–29).

With respect to her first argument, Ms. Morris claims that ALJ Kim's functional assessment of V.V.'s mental impairments was flawed because he improperly evaluated Dr. Santarpia's opinion and substituted his lay opinion for medical opinion.  (Id. at 20–22).[8]  She argues that "Dr. Santarpia's report suffers from the inherent limitations of the consultative examination—the foremost being its snapshot quality."  (Id. at 20).  Ms. Morris also criticizes the ALJ's reliance on Dr. Santarpia's opinion that V.V. can count and do mathematical calculations to support his determination that she has a less than marked limitation in attending and completing tasks.  (Id. at 21–22).   Ms. Morris does not dispute V.V.'s "intellectual capacity to count or add 3+2[,]" but claims that "[w]hat is in question, and what the regulation cares about, is her ability to sustain that activity."  (Id. at 21).  She argues that "[n]o reasonable fact finder, relying on Dr. Santarpia's observation that V.V. could count, would conclude that her ability to sustain attention was unimpaired."  (Id. at 21–22).

---

[8] Ms. Morris did not respond to the Commissioner's argument that ALJ Kim reasonably concluded that V.V.'s mental impairments do not meet or medically equal Listings 112.02, 112.10, or 112.11.  (ECF No. 30).  To the contrary, despite a passing claim that V.V.'s mental impairments meet "the separate listings that encompass ADHD and ASD" (ECF No. 30 at 5), Ms. Morris expressly "limit[s] her discussion to the question of functional equivalence" and does not analyze whether V.V.'s impairments meet any Listing.  (Id. at 20 n.7).  Ms. Morris claims she did so "[t]o avoid unnecessary repetition" because "[a]s a practical matter, there is little or no difference between the B criteria for psychiatric disorders and the first four domains" for functional equivalence.  (Id.)  Ms. Morris fails, however, to even acknowledge — must less analyze—the other criteria of the relevant Listings.  Accordingly, the Court limits its discussion to the issue of functional equivalence.  See Cruz v. Comm'r of Soc. Sec., No. 19 Civ 9253 (ATB) (CM), 2021 WL 4123969, at *14 (S.D.N.Y. Aug. 25, 2021) (finding that, because the "Plaintiff [did] not challenge the ALJ's determination that her impairments did not meet or medically equal the requirements of any Listing[,]" she was "not disabled . . . unless she has an 'extreme' limitation in one of the six domains of functioning set forth in 20 C.F.R. § 416.926a . . . or 'marked' limitations in at least two of those domains."), adopted by, 2021 WL 4124225 (S.D.N.Y. Sept. 9, 2021).

To support her second argument, Ms. Morris claims that "[t]he ALJ's failure to secure medical opinion evidence itself constituted a violation of his duty to develop the record."  (ECF No. 30 at 22–23).  She notes, inter alia, that the ALJ had the ability—but failed—to "request medical opinions from treating or examining sources who have not offered one[,]" specifically "the psychologists who treated V.V. for more than a year as part of the Montefiore Healthy Steps Program, Dr. Reznick, V.V.'s pediatrician and primary care physician, Drs. Diaz and Moore, who performed extensive evaluations with testing for the school district, and W. Cruz-Gonzalez, the school psychologist who participated in the development of V.V.'s behavior intervention plan in October 2018."  (Id. at 23).

Finally, Ms. Morris argues that "[t]he ALJ decision in this case lacks any meaningful explanation for why he decided what he decided."  (ECF No. 30 at 25).  As an example, Ms. Morris notes that, for the domain of "caring for yourself," the ALJ "references V.V.'s lack of impulse control, propensities to bite objects and hit other children, fine motor skill deficits, lack of emotional distress during Dr. Santarpia's exam, fluent speech, ability to play with friends, enjoyment of dancing and singing, and former inability to attend daycare or visit her mother in jail because of her autoimmune disorder[,]" but fails to indicate the "weight given to any of these factors."  (Id. at 25 (citing R. 26)).  Ms. Morris also argues that, "[i]n the domain of Attending and Completing Tasks, . . . the ALJ said nothing about the consideration he gave to the role of structured settings."  (Id.)  Ms. Morris acknowledges that this argument "overlaps a good deal" with her first argument.  (ECF No. 34 at 10).

### 3.  **The Commissioner's reply**

The Commissioner makes two arguments on reply.  (ECF No. 31).  First, the Commissioner argues that "substantial evidence supports the ALJ's findings of a less than marked limitation in the domain of attending to and completing tasks."  (Id. at 3–8 (capitalization omitted)).  In doing so, the Commissioner relies heavily on Dr. Santarpia's observations, and argues that "[i]t is within the ALJ's discretion to resolve genuine conflicts in the evidence."  (Id. at 3–4).  Regarding Dr. Santarpia's assessment of intact attention and concentration based on V.V.'s ability to count and perform simple math, the Commissioner argues that "attention and concentration are routinely assessed in adults and children alike by evaluating the ability to count and do math."  (Id. at 5–6 (citing Leisten v. Colvin, No. 12-CV-6698 (FPG), 2014 WL 4275710, at *14 (W.D.N.Y. Aug. 28, 2014) and Jones ex rel. T.J. v. Astrue, No. 07-CV-4886 (SLT), 2010 WL 1049283, at *2 (E.D.N.Y. Mar. 17, 2010)).  The Commissioner also notes that "child psychologist Erik Moore, like Dr. Santarpia, had also evaluated V.V.'s attention and concentration based on her ability to count."  (Id. at 5 (citing R. 1048)).  Similarly, the Commissioner notes that "[t]he ALJ also found partially persuasive Dr. Gandhi's record-based opinion that V.V. had no limitations in the domain of attending to and completing tasks."  (Id. at 6 (citing R. 19–20)).

Second, the Commissioner argues that "substantial evidence supports the ALJ's findings of a less than marked limitation in the domain of self-care."  (ECF No. 31 at 8–12 (capitalization omitted)).  In doing so, the Commissioner again cites Dr. Santarpia's report, acknowledges the contradicting Record evidence, and argues that "[i]t was within the ALJ's purview to reconcile this conflicting evidence."  (Id. at 8).  In response to Ms. Morris' argument that the ALJ decision "lacks any meaningful explanation for why he decided what he decided," the Commissioner

argues that "the Court here may glean the ALJ's rationale in making his domain-related findings." (Id. at 9).  The Commissioner also argues that Ms. Morris "appears to be confusing these accounts of V.V.'s [symptoms, activities, and abilities]—for which the regulations do not impose a weighing requirement—with a medical opinion, the persuasiveness of which the ALJ is required to explain."  (Id. at 9 (citing 20 C.F.R. § 416.920c(b)(2)).

### 4.  Ms. Morris' reply

In her reply, Ms. Morris largely reiterates the three arguments she made in her Motion. (ECF. No. 34).  In response to the Commissioner's reliance on Dr. Gandhi's opinion as further evidence of V.V.'s ability to sustain attention, Ms. Morris notes that "Dr. Gandhi offered no opinion on the psychiatric evidence because none of it was in the file at the time he or she reviewed V.V.'s claim" in 2017.  (Id. 8).

### B.  Evaluation of the ALJ Decision

#### 1.  The ALJ's functional equivalence determinations are not supported by substantial evidence.

In determining that V.V.'s impairments, singly or in combination, did not functionally equal the severity of one of the Listings, ALJ Kim determined, inter alia, that V.V. had "less than marked" limitations in the domains of attending and completing tasks and caring for herself. (R. 21–23, 25–26).  As discussed above, Ms. Morris argues that the ALJ failed to adequately explain these determinations, and specifically criticizes the ALJ's reliance on Dr. Santarpia's Report in reaching those conclusions.

##### a.  Attending and completing tasks

"In this domain, [the Commissioner] consider[s] how well [child claimants] are able to focus and maintain [their] attention, and how well [they] begin, carry through, and finish [their]

activities, including the pace at which [they] perform activities and the ease with which [they] change them." 20 C.F.R. § 416.926a(h).  For pre-school age children like V.V., the Commissioner's regulations provide:

> you should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

20 C.F.R. § 416.926a(h)(2)(iii).

### b.  Caring for yourself

In this domain, "[the Commissioner] consider[s] how well [child claimants] maintain a healthy emotional and physical state, including how well [they] get [their] physical and emotional wants and needs met in appropriate ways; how [they] cope with stress and changes in [their] environment; and whether [they] take care of [their] own health, possessions, and living area." 20 C.F.R. § 416.926a(k).  "Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety."  20 C.F.R. § 416.926a(k)(1)(i).

### c.  Analysis

The Court agrees with Ms. Morris that ALJ Kim's determinations with respect to these two domains were not supported by substantial evidence.

In his assessment of V.V.'s ability to attend and complete tasks, the ALJ explicitly acknowledged significant Record evidence regarding V.V.'s hyperactivity and inattention.  (R. 22).

This included the Function Report and Hearing testimony indicating that V.V. could pay attention only "for 15 minutes[,]" "was suspended from school three times in four days," and "has no impulse control" and  "needs one on one attention" to stay on task.  (R. 22).  He also noted V.V. "had measures of over-activity and restlessness" during psychiatric evaluations conducted by Dr. Moore and Dr. Santarpia (R. 22 (citing R. 1041–44; <u>see</u> R. 22 (citing R. 1291)), and Dr. Moore's finding that she "was restless and hyperactive, and required frequent redirection in one exam, and her attention and concentration and memory skills appeared mildly deficient, likely due to inattentiveness, and she required repetition of instructions, and her attention and concentration fluctuated with distractibility."  (R. 22 (citing R. 1048)).  Despite this substantial record of V.V.'s difficulties with attending and completing tasks, ALJ Kim—relying almost exclusively on Dr. Santarpia's observations at the Post-Hearing CE that V.V. could do age-appropriate mathematical counting and calculation and had "intact" recent and remote memory—concluded that V.V.'s limitation in this domain was "less than marked."  (R. 22–23 (citing R. 1293–94)).

Similarly, within respect to V.V.'s ability to care for herself, ALJ Kim set forth various records suggesting V.V. would have marked limitation in this domain.  He cited V.V.'s "issues with habits and ability for personal care that include bladder control, eating using utensils, dressing, washing or bathing, brushing her teeth, and putting toys away[,]" as reflected in the Function Report.  (R. 26 (citing R. 156)).  He also noted Ms. Morris' Hearing testimony, in which she "described [V.V.] as having no impulse control, that she has crisis with changing patterns or routines, and as having acted violently and/or sexually[,]" and V.V.'s "behavioral difficulties such as loss of temper, defiance, aggressiveness towards peers, throwing objects, and biting clothing." (R. 26 (citing R. 1047)).  Despite this evidence, the ALJ relied on the findings that, at the Post-

Hearing CE, V.V "appeared well groomed and had intelligible and fluent speech, coherent and goal directed thought processes, and a full and appropriate range of affect" (R. 36 (citing R. 1293)), and that she "was reported able to dress and groom herself, help with chores, get snacks, do her homework, play with friends, do sports, dancing, and singing, and go to the aquarium, museums, and the zoo."   (R. 26 (citing R. 1295)).  Based on this evidence, the ALJ determined that V.V. has a less than marked limitation in this domain.  (R. 25–26).

The Court finds that ALJ Kim's determinations in these domains were legally deficient for two reasons.  First, ALJ Kim did not adequately explain his determination that V.V. has less than marked limitations in these domains.  "The Act requires the ALJ to set forth 'a discussion of the evidence' and the 'reasons upon which [the decision] is based.'"  Lent, 2020 WL 1516466, at *6 (quoting 42 U.S.C. § 405(b)(1)).  As discussed above, however, the ALJ's own discussion of the Record reveals that V.V. appears to have clear limitations with respect to her ability to pay attention and to care for herself.  Despite this evidence, the ALJ concluded, with no substantive analysis or other discussion, that V.V.'s limitations in these domains were less than marked.  It is well settled that "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence."  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  "Although this Court must accept the ALJ's reasonable interpretation of evidence, the ALJ has not provided any explanation suggesting how a reasonable fact-finder could interpret these opinions as supportive of a less than marked, rather than marked, limitation in the domains of" attending and completing tasks and caring for oneself.  Hicks v. Comm'r of Soc. Sec., No. 18-CV-00467, 2020 WL 1061488, at *6 (W.D.N.Y. Mar. 5, 2020) ("This Court cannot say that the evidence in the record

as a whole definitively supports marked limitations, but the ALJ failed to provide the requisite explanation to enable review of whether her finding in the domains was supported by substantial evidence."); see McClain v. Barnhart, 299 F. Supp. 2d 309, 325 (S.D.N.Y. 2004) ("While each of these three facets of [the claimant]'s impaired functioning may not, in isolation, amount to a marked or severe limitation, in combination, they cannot summarily be dismissed as less-than-marked, which is what the ALJ's . . . decision has done."); Colon v. Apfel, 133 F. Supp. 2d 330, 343 (S.D.N.Y.2001) (ordering remand where ALJ restated the regulations applicable to the domains of functioning, "followed by a brief and conclusory statement that the plaintiff's limitation in that category of functioning was 'less than marked'").  Accordingly, the Court cannot conclude that the ALJ's determinations with respect to these domains was supported by substantial evidence.

Second, the ALJ failed to adhere to the Commissioner's regulations governing child disability applications, specifically regarding the factors that an ALJ will consider in evaluating the effects of a child's impairments on her functioning.  See 20 C.F.R. § 416.924a(b).  As discussed above, in concluding that V.V. had less than marked limitations in these domains, ALJ Kim relied heavily on Dr. Santarpia's observations of V.V. at the Post-Hearing CE.  (See R. 22–23 (noting that Dr. Santarpia found intact attention and concentration); R. 24 (noting that Dr. Santarpia found V.V was "cooperative" and "did not present with any social defects")).  While the Commissioner correctly argues that "[i]t is within the ALJ's discretion to resolve genuine conflicts in the evidence" (ECF No. 31 at 3–4), the Commissioner's own regulations indicate that, in this instance, there was no conflict to resolve.  As discussed above, the Commissioner recognizes that "[c]hildren may function differently in unfamiliar or one-to-one settings than they do in their usual settings at home, at school, in childcare or in the community," and that a child "may appear

more or less impaired on a single examination (such as a consultative examination) than indicated by the information covering a longer period." 20 C.F.R. § 416.924a(b)(6).   Indeed, the Commissioner recognizes the "well-known clinical phenomenon that children with some impairments (for example, AD/HD) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a CE."  SSR 09-2p, 2009 WL 396032, at *12 (citing 20 C.F.R. § 416.924a(b)(6)).   Accordingly, the Commissioner "will not draw inferences about your functioning in other situations based only on how you function in a one-to-one, new, or unusual situation." 20 C.F.R. § 416.924a(b)(6).  Here, however, that is precisely what the ALJ did.

Similarly, as Ms. Morris correctly argues (ECF No. 30 at 25), the ALJ failed to consider the effects of V.V.'s "need for a structured setting and the degree of limitation in functioning [the claimant has] or would have outside the structured setting."  20 C.F.R. § 416.924a(b)(5)(iv).  As discussed above, in evaluating the effects of a child's impairment on her functioning, an ALJ must consider, inter alia, "[h]ow well [the child] can initiate, sustain, and complete [his or her] activities, including the amount of help or adaptations [the child] need[s], and the effects of structured or supportive settings."  20 C.F.R. § 416.924a(b)(5).  In particular, "[the Commissioner] will consider how effectively you function by examining how independently you are able to initiate, sustain, and complete your activities despite your impairment(s), compared to other children your age who do not have impairments,"  and "will consider: (A) The range of activities you do; (B) Your ability to do them independently, including any prompting you may need to begin, carry through, and complete your activities; (C) The pace at which you do your activities; (D) How much effort you need to make to do your activities; and (E) How long you are able to sustain your activities."  20 C.F.R. § 416.924a(b)(5)(i).  Here, despite evidence that V.V. required

a structured learning environment and IEP due to her AHD, ASD, and adjustment disorder (see R. 1011–81), the ALJ did not even mention these needs in his evaluation of V.V.'s ability to care for herself.  (R. 26).  While an ALJ is not always required to "explicitly address the issue of how the child might function outside of structured settings," Briggs v. Colvin, No. 7:15-CV-0071 (GTS), 2016 WL 344973, at *4 (N.D.N.Y. Jan. 27, 2016), the Court is unable to conclude from ALJ Kim's analysis that he gave any consideration to V.V.'s "need for a structured setting and the degree of limitation in functioning [the claimant has] or would have outside the structured setting."  20 C.F.R. § 416.924a(b)(5)(iv).

Because the ALJ determined that V.V. had a marked limitation in the domain of interacting with others (R. 23–24), finding a marked limitation in either attending and completing tasks or caring for herself would have resulted in a determination that V.V. is disabled.  20 C.F.R. § 416.926a(a).  Accordingly, the ALJ's error was nor harmless, and remand is appropriate.

### d.  Remaining domains

Ms. Morris has not challenged the ALJ's findings with respect to the remaining domains of functioning, which include acquiring and using information, interacting and relating with others, moving about and manipulating objects, and physical well-being.  (See ECF No. 30 at 5, 25; ECF No. 34 at 12).  The Court thus need not analyze them.  See Nicole A. v. Comm'r of Soc. Sec., No. 19-CV-1654L, 2021 WL 916016, at *5 (W.D.N.Y. Mar. 10, 2021) (limiting analysis to "functional domain findings specifically challenged by plaintiff").

\*                      \*                      \*

Accordingly, the Court finds that the ALJ failed to adequately explain his functional equivalence determinations, and that remand is warranted.  On remand, the ALJ should apply the guidance set forth in 20 C.F.R. § 416.924a(b)(5).

### 2.  Duty to Develop the Record

Because the Court has already found that, for the reasons discussed above, remand for further evidentiary proceedings is necessary, the Court need not decide Ms. Morris' remaining argument concerning the Commissioner's duty to develop the record.  Wilson v. Berryhill, No. 6:17-CV-06880-MAT, 2018 WL 5118339, at *4 (W.D.N.Y. Oct. 22, 2018) ("Finding remand necessary for the reasons explained above, the Court need not and does not reach Plaintiff's remaining arguments concerning the ALJ's duty to develop the record."); c.f. Morales v. Colvin, No. 13 Civ. 6844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (not reaching additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), adopted by, 2015 WL 2137776 (S.D.N.Y. May 4, 2015); see also Ewen v. Saul, No. 19 Civ. 9394 (SLC), 2021 WL 1143288, at *17 (S.D.N.Y. Mar. 23, 2021).  On remand, the ALJ should determine whether additional evidence is necessary to assess the functional equivalence of V.V.'s mental impairments.

**V.CONCLUSION**

For the reasons set forth above, Ms. Morris' Motion is GRANTED, the Commissioner's Motion is DENIED, the ALJ Decision denying benefits is vacated, and the matter is remanded to the agency for further proceedings.

The Clerk of Court is respectfully directed to close this case.

Dated:       New York, New York
             February 1, 2022

                                        SO ORDERED.

                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge